The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
April 30, 2020

## 2020COA75

**No. 19CA0155, *May v. Petersen*— No. 19CA0155, *May v. Petersen*— Regulation of Vehicles and Traffic — Pedestrians — Drivers to Exercise Due Care — Duty to Yield to Individuals with Disabilities**

A division of the court of appeals considers whether a driver
must be held liable as a matter of law when an individual with an
obviously apparent disability and the driver's vehicle collide in a
crosswalk. Relying on *McCall v. Meyers*, 94 P.3d 1271 (Colo. App.
2004), and the facts of the case, the division decides that the
language of section 42-4-808(1), C.R.S. 2019, does not create strict
liability for a driver. The trial court properly denied the appellant's
argument that the appellee is strictly liable and instead determined
the issues of negligence and liability based on the facts of the case.

The division further considers whether a "crosswalk" includes the ramp connecting a sidewalk to a roadway.  Relying on a plain language analysis of section 42-4-802(1), C.R.S. 2019, and section 42-1-102(21), (85), and (112), C.R.S. 2019, the division determines that a crosswalk is limited to the portion of a roadway — exclusive of any shoulders or sidewalks — designated for pedestrian crossing. Therefore, the trial court properly denied appellant's argument that a crosswalk includes the ramp.

Finally, the division considers the proper standard of care to apply to a person in a wheelchair. The division determines that the trial court properly accounted for appellant's disabled status by considering the facts specific to the case. Therefore, the trial court did not err in assessing appellant's actions or abilities.

Court of Appeals No. 19CA0155
El Paso County District Court No. 17CV31486
Honorable David Prince, Judge

David May,

Plaintiff-Appellant,

v.

Michelle Petersen,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE GOMEZ
Dailey and Navarro, JJ., concur

Announced April 30, 2020

Robert J. Anderson, P.C., Robert J. Anderson, Scott F. Anderson, Denver, Colorado, for Plaintiff-Appellant

Resnick & Louis, P.C., Kurt Christian Temple, Andrew D. Kurpanek, Centennial, Colorado, for Defendant-Appellee

¶ 1     In this personal injury action involving a collision between a wheelchair-using pedestrian and a motor vehicle, plaintiff, David May, appeals the judgment entered in favor of defendant, Michelle Petersen, following a trial to the court.  Among the issues raised on appeal are the construction of sections of the traffic code regarding vehicles that "approach[] an individual who has an obviously apparent disability," the meaning of the term "crosswalk" within the traffic code's right-of-way provisions, and the standard of care applicable to wheelchair-using pedestrians.  Because we conclude the trial court correctly applied the law on these issues, and because the trial court's factual findings are supported by the record, we affirm.

## I.     Background

¶ 2     During a morning school drop-off, Mr. May's wheelchair and Ms. Petersen's vehicle collided in a crosswalk in front of their respective children's school.  A ramp connects the crosswalk to an adjacent sidewalk, as depicted in the picture below.

1



EXHIBIT

¶ 3     Just before the accident, Mr. May exited the school and was navigating his wheelchair down the sidewalk toward the roadway so he could cross at the crosswalk and return to his car on the other side of the road.  The sidewalk gained a half-inch per foot, which was an abnormally steep grade for a sidewalk but conformed to the natural slope of the land.

¶ 4     At the same time, Ms. Petersen was driving the first vehicle in the school drop-off lane.  She was situated just at the edge of, or just inside, the crosswalk.  Two drivers positioned a few cars behind

Ms. Peterson testified that they observed Mr. May move along the sidewalk in his wheelchair but lost sight of him when he neared the roadway. However, Ms. Petersen testified that she didn't see Mr. May before the accident. She claimed that after she dropped off her child, she looked but didn't see anyone in the crosswalk, then looked over her shoulder for five to ten seconds to assess traffic with the intent to enter an adjacent lane. As Ms. Petersen moved her vehicle forward, still assessing the traffic, Mr. May entered the crosswalk in his wheelchair. The two collided, causing Mr. May to suffer a head injury.

¶ 5    After a bench trial, at which the parties presented witness testimony as well as a surveillance video of the incident, the trial court found that

> [Ms. Petersen's] vehicle entered the crosswalk prior to [Mr. May] by a wide margin. [Mr. May] proceeded into the crosswalk after the vehicle was already well into and blocking the crosswalk. [Mr. May] entered the crosswalk without adequately checking to see if the crosswalk was clear or following his normal routine of pausing to check traffic. Moreover, at the point where [Mr. May] believes he would normally have paused, he was still approximately 5-6 feet away from the curb, the vehicle was in motion, well into the crosswalk, and clearly visible from [his] location.

3

According to the court's findings, Mr. May struck "the side of the vehicle at nearly the midpoint of the vehicle and at the midpoint of the lane or approximately 4 feet into the roadway."

¶ 6    At trial, Mr. May testified that, according to his usual custom, he paused at what he referred to as the "landing pad" — an area that connects the sidewalk to the ramp — before entering the ramp down to the roadway.  But the trial court found Mr. May didn't pause on the landing pad on the day of the accident.  The court also found Mr. May was "traveling at an unreasonable rate of speed for the conditions and does not appear to have kept a proper lookout" just before the accident.

¶ 7    Finding that Mr. May hadn't demonstrated Ms. Petersen was negligent and that the accident was more likely than not caused by Mr. May's negligence, the court entered judgment in favor of Ms. Petersen and against Mr. May.

¶ 8    Mr. May presents three issues on appeal: (1) sections 42-4-807 and 42-4-808, C.R.S. 2019, established Ms. Petersen's liability as a matter of law; (2) the ramp was necessarily part of the "crosswalk" within the meaning of section 42-4-802, C.R.S. 2019, such that he entered the crosswalk first and had the right of way; and (3) the

trial court erroneously considered his actions based on the standard of care for a walking person rather than modifying the standard to account for his wheelchair use.

¶ 9     We disagree as to each issue and affirm.

## II.     Standard of Review

¶ 10     "When a court enters a judgment following a bench trial, that judgment presents a mixed question of law and fact." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12.  While we review the court's application of the governing legal standards de novo, we review the court's factual findings for clear error.  *Id.*  In doing so, we defer to the court's credibility determinations, and we won't disturb the court's factual findings unless they are not supported by the record.  *Id.*

¶ 11     We also review de novo a trial court's interpretation and application of a statute.  *People v. Patton*, 2016 COA 187, ¶ 7.  Our goal in interpreting a statute is to give effect to the legislature's intent.  *Id.* at ¶ 9.  We read statutory words and phrases in context, interpret them according to their plain meaning, and construe them according to the rules of grammar and common usage.  *Id.*  We also avoid "constructions that would render any words or phrases

5

superfluous or lead to illogical or absurd results." *Id.* (citation

omitted).

## III.   Analysis

### A.   Application of Sections 42-4-807 and 42-4-808

¶ 12    Mr. May first argues that, under sections 42-4-807 and 42-4-808, Ms. Petersen was negligent as a matter of law for failing to yield the right-of-way to Mr. May.  We disagree.

¶ 13    Section 42-4-808(1) provides, in relevant part, as follows:

> [A]ny driver of a vehicle who approaches an individual who has an obviously apparent disability shall immediately come to a full stop and take such precautions before proceeding as are necessary to avoid an accident or injury to said individual. . . .  A disability shall be deemed to be obviously apparent if, by way of example and without limitation, the individual is using a mobility device, is assisted by a service animal, as defined in section 24-34-301, C.R.S., is being assisted by another person, or is walking with an obvious physical impairment.

The statute further provides that any person who violates

any of its provisions commits a class A traffic offense.  *Id.*

¶ 14    Section 42-4-807 also requires drivers to "exercise due care" to avoid colliding with a pedestrian on a roadway and to "exercise proper precaution" upon observing a child or an obviously confused

6

or incapacitated person upon a roadway.  This section similarly makes violation of its requirements a class A traffic infraction.  For this and all other sections of the traffic code, a "pedestrian" includes both a person walking afoot and a person using a wheelchair.  § 42-1-102(68), C.R.S. 2019.

¶ 15    Mr. May argues that Ms. Petersen "[b]y definition . . . must have been negligent for her failure to stop" because she failed to immediately stop and take precautions to avoid a collision, as required by section 42-4-808(1) in light of his obviously apparent disability.  He maintains that the trial court should've found Ms. Petersen negligent as a matter of law based on her failure to obey the requirements of sections 42-4-807 and 42-4-808, her failure to observe him when other drivers in the drop-off lane did, and her admission that she looked over her shoulder for five to ten seconds while driving her vehicle in a school zone crosswalk.

¶ 16    We are not persuaded.  "Issues of negligence . . . are questions of fact to be determined by the [fact finder], and we will not overturn its decision on those questions where there is competent evidence from which the [fact finder] could have logically reached its verdict." *Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 2015 COA 82, ¶ 36.

¶ 17    There is competent evidence to support the trial court's factual findings on negligence.  In fact, the evidence in this case is significantly different than the evidence in the cases Mr. May cites where liability was resolved in plaintiffs' favor as a matter of law. For instance, in *Radetsky v. Leonard*, the pedestrian was already halfway across the road when she was struck by a turning vehicle; while she may have been a few feet to the side of the unmarked crosswalk area, the evidence indicated those few feet made no difference in the driver's failure to see her on the roadway.  145 Colo. 358, 359-62, 358 P.2d 1014, 1015-16 (1961).  Similarly, in *Ridenour v. Diffee*, the pedestrians made it almost to the center of the roadway before a turning vehicle struck them in the crosswalk. 133 Colo. 467, 468-70, 297 P.2d 280, 281-82 (1956).

¶ 18    In this case, the trial court found, based upon the evidence submitted at trial (including a close review of the video of the accident), that Ms. Petersen's vehicle was already well into the crosswalk when Mr. May entered it.  In particular, the trial court's findings included the following:

- Ms. Petersen's vehicle "entered the crosswalk prior to [Mr. May] by a wide margin";

- Mr. May "proceeded into the crosswalk after the vehicle was already well into and blocking the crosswalk . . . without adequately checking to see if the crosswalk was clear";

- when Ms. Petersen began driving into the crosswalk, Mr. May "was somewhere around 11 or 12 feet away from the curb";

- when Mr. May was "approximately 5-6 feet away from the curb, the vehicle was in motion, well into the crosswalk, and clearly visible from [his] location"; and

- Mr. May struck "the side of the vehicle at nearly the midpoint of the vehicle."

¶ 19 Based on these findings, Mr. May wasn't traveling across the road just to the side of the crosswalk area, as in *Radetsky*. Rather, he was still about a dozen feet from the roadway when Ms. Petersen started driving through the crosswalk. Under these circumstances, negligence was a question of fact that the trial court properly resolved.

¶ 20 More specifically, as to section 42-4-807, the statute imposes a duty for drivers to "exercise due care," but whether Ms. Petersen

exercised due care is a factual question that was properly resolved by the fact finder in this case. And as to section 42-4-808(1), the statute requires a vehicle to stop and take certain precautions when it "approaches an individual who has an obviously apparent disability." "Approach" is commonly defined as the "draw[ing] closer to" or "com[ing] very near to." Merriam-Webster Dictionary, https://perma.cc/R3HZ-HEEQ. Here, the trial court's detailed findings signify that Ms. Petersen's vehicle wasn't *approaching* Mr. May. Instead, her vehicle was driving *away* from the sidewalk where Mr. May was traveling, and it was Mr. May who approached and collided with the vehicle.

¶ 21    Additionally, while sections 42-4-807 and 42-4-808(1) make violation of their provisions a traffic offense, and such a violation could be negligence per se, this doesn't necessarily mean a driver will be liable for negligence anytime a vehicle has an accident with a pedestrian who has an obviously apparent disability or is obviously incapacitated. For instance, as a division of this court recognized in *McCall v. Meyers*, section 42-4-808(1) doesn't abrogate the defense of comparative negligence. 94 P.3d 1271, 1273 (Colo. App. 2004).

¶ 22    Mr. May's argument essentially would create strict liability for any vehicle that comes in contact with an individual who as an obviously apparent disability, regardless of the circumstances. But section 42-4-808(1), by its plain language, doesn't do that. What it does is require vehicles to stop and take precautions when they approach such individuals. The trial court explained why a court must consider the circumstances (including whether the vehicle was "approaching" the pedestrian) of any collision:

> By way of extreme rhetorical example, if [Mr. May] had struck the vehicle from behind in the center of the rear bumper moving at a higher rate of speed than the vehicle, having the point of collision in the crosswalk would not require a finding that the driver was negligent and that this caused the collision.

We agree with this analysis. We therefore recognize that, in cases involving vehicle/wheelchair collisions, as in most cases, questions of negligence and liability depend on the circumstances and usually must be resolved by the finder of fact.

¶ 23    Therefore, sections 42-4-807 and 42-4-808 didn't require entry of judgment as a matter of law for Mr. May. And because the trial court's findings on negligence and liability are adequately

11

supported by the record, we find no clear error and will not disturb the trial court's decision.

B.    Definition of a "Crosswalk" Under Section 42-4-802(1)

¶ 24    Mr. May next argues that the trial court applied the term "crosswalk" too restrictively: to include only the path in the roadway to the exclusion of the handicap ramp.  He posits that if the court had properly interpreted "crosswalk" to include the ramp, it necessarily would've found that he was in the crosswalk when Ms. Petersen started to move and, thus, would've found that he had the right of way and Ms. Petersen was at fault for the accident. Again, we disagree.

¶ 25    Section 42-4-802(1) requires drivers to

> yield the right-of-way, slowing down or stopping if need be to so yield, *to a pedestrian crossing the roadway within a crosswalk* when the pedestrian is upon the half of the roadway upon which the vehicle is traveling or when the pedestrian is approaching so closely from the opposite half of the roadway as to be in danger.

(Emphasis added.)  On the other hand, section 42-4-802(3) directs that "[a] pedestrian shall not suddenly leave a curb or other place of

12

safety" and move "into the path of a moving vehicle that is so close as to constitute an immediate hazard."

¶ 26     Section 42-1-102(21) defines a crosswalk as "that *portion of a roadway* ordinarily included within the prolongation or connection of the lateral lines of sidewalks at intersections or any portion of a roadway distinctly indicated for pedestrian crossing by lines or other marking on the surface." (Emphasis added.)  A roadway, in turn, is defined as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the sidewalk, berm, or shoulder." § 42-1-102(85).  The statute expressly states that a wheelchair is not a vehicle.  § 42-1-102(112).

¶ 27     Mr. May argues that the ramp (or curb cut) — which allows a handicapped person access to enter the roadway — must be considered a part of the "crosswalk."  He bases his argument largely on federal and state laws requiring crosswalks to include ramps to allow access for persons with disabilities.  He also argues that once wheelchair-using persons have entered a ramp, they can't stop due to gravity pulling them into the roadway.

¶ 28     We agree with the trial court's conclusion that a "crosswalk" for purposes of section 42-4-802(1) doesn't include a handicap

13

ramp.  Section 42-1-102(21) limits the boundaries of a crosswalk to a "portion of a roadway," and a "roadway" includes only the part of a highway that is used for vehicular and not pedestrian (including wheelchair) travel, § 42-1-102(68), (85), (112).  The fact that other federal or state provisions may require ramps in order to allow persons with disabilities *access* to a crosswalk doesn't render the entire pedestrian access route *part of* the crosswalk.  And, to the extent that Mr. May argues about his inability to stop his wheelchair before entering the roadway, we must defer to the trial court's findings (which are supported by the record) that Mr. May was traveling at an unsafe speed under the circumstances and that, contrary to his testimony, he didn't pause on the landing pad before entering the ramp down to the roadway.  Therefore, we conclude that the trial court didn't err in its interpretation and application of the term "crosswalk."

¶ 29    Mr. May also argues that, even if the crosswalk doesn't include the ramp, thus establishing his right of way, Ms. Petersen still should be held liable for failing to use reasonable care to maintain control over her vehicle.  But whether Ms. Petersen exercised reasonable care and whether Mr. May was negligent in "suddenly

14

leav[ing] a curb or other place of safety" and moving "into the path of a moving vehicle that is so close as to constitute an immediate hazard" (under section 42-4-802(3)) were factual questions that were for the trial court to resolve. Because its findings are supported by the record, we won't disturb them on appeal.

## C. Standard of Care

¶ 30 Finally, Mr. May argues that the trial court erroneously applied an ordinary standard of care to his actions, rather than modifying the standard to reflect his wheelchair-using status. Again, we disagree.

¶ 31 Pedestrians are "required to use such care as a reasonably prudent person would use in like situation, and what constitutes such care is normally a question of fact for the [fact finder]." *Pueblo Transp. Co. v. Moylan*, 123 Colo. 207, 211, 226 P.2d 806, 808 (1951).

¶ 32 Mr. May points to the Restatement (Second) of Torts section 283C (1965), which provides that, "[i]f the actor is ill or otherwise physically disabled, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man

under like disability."[1]  He also points to *McCall*, which approved a jury instruction stating that "[i]f a person is physically disabled, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable person under like disability."  94 P.3d at 1273.

¶ 33     The parties disagree on whether it is the *standard of care* or the *standard of conduct* that changes based on a party's disability status.  We needn't resolve this issue, however, as either way it appears the trial court appropriately took into account all the relevant circumstances — including Mr. May's disability status — in assessing Mr. May's actions.  For instance, in its assessment, the court addressed the restrictions Mr. May claimed resulted from his limited ability to stop and his restricted visibility in a wheelchair:

> Given the level of vehicle and pedestrian traffic, the nature of the pedestrian intersection, *the known slopes involved,* and *the visibility restrictions [Mr. May] noted for him to see cars and cars to see him* when in the vicinity of the crosswalk, [Mr. May] appears to have been traveling at an unreasonable rate of

---

[1] The more recent Restatement (Third) of Torts: Physical & Emotional Harm section 11(a) (2010) provides that "[t]he conduct of an actor with a physical disability is negligent only if the conduct does not conform to that of a reasonably careful person with the same disability."

> speed for the conditions and does not appear
> to have kept a proper lookout.

(Emphases added.)

¶ 34    Mr. May's two primary arguments on this issue are that the trial court "note[d] Mr. May's speed in relationship to able-bodied persons" and that the trial court failed to acknowledge his inability to quickly stop on a steep grade without injuring himself.  Neither argument is persuasive.

¶ 35    As to the first argument, it was Mr. May who, during his trial testimony, compared the speed of a person using a wheelchair to that of a person walking, stating that "you do tend to travel slightly faster [in a wheelchair] than walking people."  As the trial court noted in its decision, Mr. May "testified that he was traveling faster than the speed of a person walking" and his counsel "argued from the video that [Mr. May] was traveling at a walking pace."  Since Mr. May injected this issue into the trial, it wasn't error — and didn't reflect the use of an improper standard — for the trial court to reject Mr. May's insistence that he was traveling only as fast as a person walking and to find instead that he "was traveling slower

17

than a person at a full run but faster than a person at a normal walk."

¶ 36 As to Mr. May's second argument, his insistence that he couldn't slow down is inconsistent with his arguments at trial. At trial, he testified that he paused at the landing pad before entering the ramp sloping down to the roadway, but that, once he entered the ramp, he could no longer stop because of the slope of the ramp. The trial court disagreed with Mr. May's factual premise, finding "a preponderance of the evidence does not support that [he] paused at any time before entering the crosswalk." Based on this finding, it would seem that to, the extent Mr. May was traveling too fast to stop just before the accident, it was due to his failure to pause on the landing pad rather than his inability to stop once he had started down the ramp. Regardless, the trial court's discussion — including its conclusion that Mr. May was traveling at an unsafe speed — doesn't suggest any failure to take Mr. May's disability status into account.

¶ 37 Therefore, we perceive no error in the trial court's assessment of Mr. May's actions.

## IV. Conclusion

¶ 38    Judgment affirmed.

JUDGE DAILEY and JUDGE NAVARRO concur.